**UNITED STATES BANKRUPTCY COURT
DISTRICT OF COLUMBIA**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **Allied Telecom Group, LLC** | **Case No. 25-00599** |
| **Debtor.** | |

**DECLARATION OF KEN WILLIAMS IN SUPPORT OF
DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

I, Ken Williams, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.     I am the Chairman, Founder, and Chief Revenue Officer of Allied Telecom Group, LLC ("*Allied*" or the "*Debtor*").  I am also the majority member of the Debtor.  I am over the age of 18 years and am competent to testify regarding the matters set forth in this declaration. I am a resident of the District of Columbia.  I have personal knowledge of the matters set forth herein and, if called as a witness, could and would testify competently with respect to such matters.

2.     I began my career in telecommunications after completing my studies in Electrical and Computer Engineering at Drexel University in 1983.  I founded Allied in 1996, and led Allied as its Chief Executive Officer until August 11, 2022.  My primary responsibilities include overall technical, operational, and financial strategic planning.  Under my leadership, Allied continually expanded its service offerings by deploying cutting-edge technology and staying apprised of the latest innovations in telecommunications.  As such, I have personal knowledge of the industry and Allied.

1

### Overview of Allied's Business

3.      Allied is an internet service provider (ISP) based in Washington D.C., predominately serving businesses, non-profits, and government agencies located in the District of Columbia, Maryland, and Virginia.  Allied focuses on delivering the "last mile" of connectivity and communication solutions to its business customers, which is the critical final segment of telecommunications networks that connects directly to an end-user's premises.  In addition to internet access, Allied provides data transport connectivity for wide-area networks and cloud/datacenter interconnection.  By leveraging diverse technologies, Allied assists customers with optimizing their "last mile" access options, even in challenging network environments where critical uptime is required.

4.      Allied also offers managed IT and network security services, including firewall protection, intrusion detection, network monitoring, and disaster recovery planning to help businesses guard against cyber threats and ensure business continuity. Allied's technical support team provides ongoing assistance, troubleshooting, and maintenance, giving clients a single point of contact for their networking and security needs.

5.      Allied is a minority owned and led company. Importantly, Allied (i) is the largest and oldest black-owned telecommunications service provider in the United States, (ii) is led by a diverse senior management team, (iii) has been certified as a Small Disadvantaged Business (SDB) by the U.S. Small Business Administration, and (iv) is a certified minority business member of the National Minority Supplier Development Council.

6.      Allied is certified as a Competitive Local Exchange Carrier ("*CLEC*").[1] As a CLEC, Allied is granted access to incumbent local exchange carriers, namely AT&T and Verizon.

---

[1] The CLEC framework emerged from the Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (1996).

This allows Allied to access the local exchange carriers' equipment and infrastructure hosting in order to provide various communication services and enable competition with these large, legacy companies. CLECs provide critical infrastructure, and are akin to a utility provider.  As such, Allied's operations are subject to Federal Communications Commission (FCC), state, and local regulations governing telecommunications and data privacy.

7.     Allied maintains an expansive customer base of approximately 1,200 businesses, including private businesses, non-profits, federal (Dept. of Defense and civilian), state and local government agencies, colleges, universities, public schools and other educational institutions, among others.  This customer base relies upon Allied to receive internet connectivity, network solutions, and data services, as well as technical support.  Allied frequently partners with property managers and commercial real estate owners to provide "building-wide" internet and communications solutions for office buildings and multi-tenant facilities.

8.     In order to deliver network and connectivity solutions to its customer base, Allied enters into agreements with network and connectivity partners, such as Verizon and Zayo.  Through these partnerships, Allied can access and resell the network infrastructure of its partners while wrapping those connectivity services with Allied's support, integration, and value-added capabilities.  These partnerships allow Allied to secure circuits linking its customers' physical locations to data centers and cloud environments.  As an independent provider, Allied does not own network infrastructure and relies on these partnerships to deliver its connectivity solutions.

9.     A distinguishing feature of Allied is its focus on personalized, local service.  The company emphasizes its regional roots and ability to provide fast, responsive support, which it markets as an advantage over larger, national carriers.  Allied's local presence also allows it to

3

offer rapid installations and troubleshooting, and to develop long-term relationships with clients who prioritize reliability and customer service, providing a competitive edge.

### Impact of COVID-19

10.    Allied, like many other businesses, was adversely affected by the COVID-19 pandemic.  In 2020, a significant portion of Allied's customer base was comprised of tenants in multitenant office buildings as well as state and local government agencies and schools.  As the transition to remote work accelerated in response to "stay at home" orders amid the global pandemic, demand for Allied's services by its business customers declined markedly, and contract renewals occurred at a much lower rate.  Allied also faced increased difficulty in generating new business during this period as potential customers transitioned to hybrid or remote-work models.

11.    In response to these challenges, Allied obtained financial support through the Main Street Lending Program (as defined below) with the objectives of mitigating the financial impact of the pandemic, providing a liquidity bridge, and positioning itself to expand with anticipated return to office policies when the pandemic eventually passed.  With the unanticipated duration of the pandemic, however, Allied's revenues continued to lag and its financial position was further strained by ongoing obligations under various vendor contracts, as well as a significant monthly commercial lease commitment described in more detail below.  During that same period, the variable rate interest on its loan through the Main Street Lending Program increased dramatically and created an additional, unanticipated cost burden.

### Cash Flow and Debtor Financials

12.    Like most telecom providers, the majority of Allied's revenue comes from recurring service fees that its customers pay for internet and data connectivity and associated maintenance and support services.  In order to generate positive cash flow, Allied purchases wholesale

connectivity from its partners and resells it to end customers at a margin, along with additional charges for Allied's add-on suite of services. Allied also generates revenue from one-time customer set-up fees and various other professional services and project work.

13.     From January 1, 2025 through October 31, 2025, Allied generated approximately $14.4 million in total income, with approximately $10.8 million attributable to revenue from providing internet and data connectivity services. Allied has historically maintained a positive net cash flow from operations while reporting accounting losses due to significant non-cash expenses including depreciation and amortization, lease obligations, and substantial interest associated with the Main Street Loan.

14.     As of the date hereof, Allied holds cash in the amount of approximately $1,235,000.00, with total assets of approximately $6.9 million, and total liabilities of approximately $15.6 million.

### Capital Structure

15.     As of the date hereof, the Debtor has approximately $7,873,981.71 in principal amount, plus accrued interest, of funded debt obligations outstanding. The Debtor's only prepetition secured obligation is a five-year term loan that Allied received on December 21, 2020 (the "*Main Street Loan*"), in the original principal amount of $10,790,272.00.[2]

16.     The Main Street Lending Program ("*MSLP*") is a federal lending program established in response to the COVID-19 pandemic as a lifeline for small and medium sized businesses. The Federal Reserve Bank of Boston ("*FRBB*") administered the program with funding from the U.S. Treasury. The loans made under the program were underwritten and

---

[2] The Main Street Lending Program was established pursuant to the Coronavirus Aid, Relief, and Economic Security Act (section 4003), Pub. L. 116-136 (2020).

originated by banks or other eligible financial institutions.  Such lenders retained a 5% economic interest, as well as servicing rights, while the FRBB purchased a 95% participation interest in the loans through a special purpose vehicle.  Loans issued under the MSLP have five-year terms, variable interest rates, a 15% principal payment due in years three and four, and a balloon payment satisfying the relevant loan in full due in year five.

17.    Quaint Oak Bank ("*Quaint Oak*") originated and continues to service the Main Street Loan.  The loan is secured by substantially all of Allied's assets.

18.    The variable interest rate on the Main Street Loan has increased substantially since it was originated in 2020.   Although, Allied is current on the Main Street Loan as of the date hereof, it has determined that it does not have the financial capability to make the fully amortized balloon payment when due on December 24, 2025 (the "*Maturity Date*").  Allied understands that Quaint Oak asserts $7,873,918.71 is due on the Maturity Date (the "*Payoff Amount*").

**Events Leading to Bankruptcy Filing**

19.    On October 14, 2025, Quaint Oak sent Allied a final maturity notice informing Allied that the Main Street Loan was due to be paid in full, in the Payoff Amount, by the Maturity Date and that no extension of the Maturity Date would be granted.

20.    Prior to the Petition Date, Allied requested that Quaint Oak enter into a forbearance agreement to allow the parties to discuss a consensual resolution and path forward in light of the upcoming Maturity Date.  Based on Quaint Oak's refusal or inability to agree to a forbearance prior to the Maturity Date, Allied was forced to file the above-captioned chapter 11 case (the "*Case*") to obtain the protections afforded by the Bankruptcy Code so that Allied can ensure that it continues to provide vital internet connectivity and support for the Debtor's customer base.

21.    Allied provides vital connectivity services to its customers, which include many businesses, non-profits, federal, state and local government agencies, educational systems.  In an

increasingly technological world, these customers rely heavily on the internet and related technology services and infrastructure Allied provides.  If Allied were forced to cease operations, its customers would be at imminent risk of losing internet connectivity and support services that could result in significant business interruptions.  Such interruptions could result in irreparable harm to the Debtor's customers, who depend on uninterrupted internet access to carry out their daily operations, including providing vital public services.

22.    Allied filed this Case in order to address the Main Street Loan and other long-term financial obligations with the intention of (i) providing continuous uninterrupted internet connectivity to its customers for the duration of the Case, (ii) restructuring its balance sheet to emerge as a stronger and healthier company, and (iii) analyzing its existing partner relationships for opportunities to increase efficiencies and explore new opportunities for growth.

### First Day Motions

23.    Contemporaneously herewith, the Debtor has filed first day motions seeking orders granting various forms of relief intended to smoothly transition into chapter 11, maintain business operations in the ordinary course, and facilitate the efficient administration of this Case.  The first day motions include the following:

- *Debtor's Motion to Expedite Hearing on, and to Shorten Time to Respond to, First Day Motions* [Docket No. 7] (the "**Motion to Shorten and Expedite**");

- *Debtor's Motion for Entry of an Order Extending the Time to File Schedules of Assets and Liabilities and Statement of Financial Affairs* [Docket No. 6] (the "**Extend Time to File Schedules and SOFA Motion**");

- *Debtor's Motion for Entry of Interim and Final Orders Authorizing the Debtor to Use Cash Collateral and Granting Adequate Protection* [Docket No. 2] (the "**Cash Collateral Motion**");

- *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Pay Certain Prepetition Wages, Salaries, Employee Benefits, Expenses, and Other Compensation, and (B) Maintain Employee Benefits Programs; and (II)*

*Directing Financial Institutions to Honor Related Checks and Transfers* [Docket No. 3] (the "***Wages Motion***");

- *Debtor's Motion for Entry of Interim and Final Orders Authorizing the Debtor to (I) Maintain Existing Bank Accounts and Business Forms, and (II) Continue to Use Existing Cash Management System* [Docket No. 4] (the "***Cash Management Motion***"); and

- *Debtor's Motion to Reject Unexpired Non-Residential Lease Nunc Pro Tunc to the Petition Date* [Docket No. 5] (the "***Lease Rejection Motion***," and collectively, the "***First Day Motions***").

24.     As described in detail below, the First Day Motions seek authority to, among other things, honor employee-related wages and benefits obligations, use cash collateral to maintain operations in the ordinary course, reject the Debtor's burdensome office lease, and otherwise effectuate the administration of the Case.

25.     Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days after the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm."  In light of this requirement, the Debtor has narrowly tailored its requests for immediate authority to pay prepetition claims to those circumstances in which the failure to pay such claims would cause immediate and irreparable harm to the Debtor and its estate.

26.     The Debtor believes that the approval of the relief sought in each of the First Day Motions is critical to ensure that the Debtor can continue to provide vital services to its customer base and otherwise successfully utilize chapter 11 to maximize the value of its estate for the benefit of its creditors and to effectuate its reorganization.

### **The Motion to Shorten and Expedite**

27.     By the Motion to Shorten and Expedite, the Debtor seeks a shortened notice period with respect to, and expedited hearing on, the First Day Motions.  There is a cognizable exigency

8

which requires a prompt ruling on each of the First Day Motions to enable the Debtor to operate as a debtor-in-possession and preserve the value of its estate.  As such, the Debtor believes hearing the First Day Motions on an expedited basis and shortening the response period accordingly is necessary and appropriate.  Further, where appropriate, the Debtor is seeking interim relief, providing parties in interest a further opportunity to contest the relief sought at a final hearing.

### The Extend Time to File Schedules and SOFA Motion

28.     By the Extend Time to File Schedules and SOFA Motion, the Debtor seeks entry of an order extending the fourteen (14) day period to file its schedules of assets and liabilities and statement of financial affairs by an additional fourteen (14) days, through and including January 20, 2026, without prejudice to the Debtor's right to request additional time should it become necessary.  Due to critical matters that the Debtor's management and professionals were required to address prior to the commencement of this Case, the Debtor was not in a position to complete the schedules and statement of financial affairs by the Petition Date, even with the assistance of professionals.  As such, the Debtor believes a 14-day extension to January 20, 2026 (without prejudice to further extensions), is necessary and appropriate.

### The Cash Collateral Motion

29.     By the Cash Collateral Motion, the Debtor seeks entry of interim and final orders (i) authorizing the Debtor to use the cash collateral of Quaint Oak, pursuant to the budget attached to the Cash Collateral Motion, as working capital for the Debtor's operating expenses and (ii) granting certain adequate protection, including the Replacement Lien and Superpriority Claims.

30.     If the requested relief is not granted, the Debtor's inability to use the Cash Collateral will effectively bring all of the Debtor's operations to a standstill.  Without the ability to use cash to pay employees, vendors, and professionals, the Debtor's customer base will face imminent risk

to internet and other telecommunication connectivity, threatening such customers' ability to provide vital public services and engage in commerce. Without use of the Cash Collateral, the Debtor will also be unable to preserve its business as a going concern, with significant loss for the Debtor's creditors and other stakeholders. As such, the Debtor believes the relief requested in the Cash Collateral Motion is necessary and appropriate.

**The Wages Motion**

31.     By the Wages Motion, the Debtor seeks entry of interim and final orders (i) authorizing, but not directing, the Debtor to pay prepetition wages, salaries and benefits, expenses, and other compensation of its Employees (ii) authorizing, but not directing, the Debtor to continue Employee Benefit Programs in the ordinary course of business; and (iii) authorizing and directing applicable financial institutions to honor and process related checks and transfers, each in the ordinary course of business. The Wages Motion does not seek authority, on an interim basis, to pay any amounts in excess of the statutory cap provided in section 507(a)(4) of the Bankruptcy Code. The Debtor reserves the right to seek payment of any such amounts at a later time, if necessary and appropriate.

32.     As of the Petition Date, the Debtor employs 19 people, including 17 full-time, salaried employees and 2 part-time, hourly employees. In addition to wages, the Debtor's Employees also generally are entitled to receive other forms of compensation, including health benefits and reimbursement of certain business expenses. The Debtor also has approximately 150 third-party independent contractor Sales Agents. The Sales Agents are paid Sales Agent Commissions equal to 20% of the fees paid by customers referred to Allied by such Sales Agent.

33.     The Debtor's workforce is critical to maintaining its business operations and the success of this Case. If the relief requested in the Wages Motion is not granted, the Debtor's

relationship with its workforce would be adversely impacted and likely suffer irreparable harm. The Debtor's business hinges on its relationship with its workforce, and the ability to provide superior, continuous services is vital. At this early stage, the Debtor simply cannot risk the substantial damage to its business that would inevitably attend any decline in its workforce's morale attributable to the Debtor's failure to pay wages, salaries, benefits, and other similar forms of compensation. It is equally important that the Debtor continue to honor its Sales Agent Commissions to ensure that Sales Agents are incentivized to continue their work for the Debtor and to generate additional sources of revenue to support operations. As such, the Debtor believes that the relief requested in the Wages Motion is necessary and appropriate.

## The Cash Management Motion

34.     By the Cash Management Motion, the Debtor seeks entry of interim and final orders (i) authorizing the Debtor to maintain existing bank accounts and business forms and to continue using its existing cash management system, and (ii) waiving the requirements of section 345(b) of the Bankruptcy Code. As of the Petition Date, the Debtor maintains one (1) account at Wells Fargo Bank, two (2) accounts at JP Morgan Chase Bank, N.A., five (5) accounts at Quaint Oak Bank, and one (1) account at First Citizens Bank.

35.     Given that Allied operates in a highly regulated industry, it contracts with Interserra, Inc. ("*Interserra*") for tax consulting and advisory services. Interserra analyzes the services provided by Allied during a given period, determines what taxes and fees are due and payable to which authorities, and provides a report to Allied. Allied then reviews and reconciles such report, and upon reconciliation, deposits the aggregate amount necessary to fund such fees and taxes into a shared account with Interserra, which Interserra then disburses on Allied's behalf.

11

36.     While the Debtor's cash management system is not overly complex, most of its customers have automatic ACH payments set up directly with existing accounts.  Given that one of the principal objectives of this Case is to ensure the provision of uninterrupted services to the Debtor's customers, requiring the Debtor to transition all of its accounts to new accounts will be unnecessarily disruptive, costly, and constitute an undue burden on the Debtor and its estate.

37.     The Debtor intends to be completely transparent with the Office of the United States Trustee and other parties in interest with respect to its cash management system and the flow of funds.  As such, the Debtor believes that the relief requested in the Cash Management Motion is necessary and appropriate and outweighs any perceived risk to parties in interest.

**The Lease Rejection Motion**

38.     By the Lease Rejection Motion, the Debtor seeks entry of an order authorizing the Debtor to reject the Office Lease and any documents related thereto, including but not limited to those certain amendments dated August 31, 2015 and December 19, 2022, effective as of the Petition Date.

39.     The Debtor vacated the Premises as of November 29, 2025, leaving it in broom clean condition.   Allied has consolidated its operations in an attempt to reduce expenses, and Allied's workforce operates nearly 100% remotely.  Allied maintains a virtual office space, which includes a mailing address and communal work space provided on an as-needed basis.  As a result, the Premises currently sits vacant .

40.     The Office Lease provides no benefit to the Debtor or its estate, and by timely rejecting the Office Lease, the Debtor will be able to avoid the accrual of unnecessary administrative expenses for the benefit of all creditors.  As such, the Debtor believes that the relief requested in the Lease Rejection Motion is necessary and appropriate.

I declare under penalty of perjury that, after reasonable inquiry, the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: December 23, 2025
District of Columbia

*Ken Williams*
Ken Williams (Dec 23, 2025 01:29:27 GMT+3)

Ken Williams
Chairman, Founder, and Chief Revenue Officer
Allied Telecom Group, LLC