**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **In re:** | **:** **Chapter 11** |
| | **:** |
| **Allied Telecom Group, LLC,** | **:** **Case No. 25-00599-ELG** |
| | **:** |
| **Debtor.** | **:** |
| | **:** |

**LIMITED OBJECTIONS OF QUAINT OAK BANK TO (I) SALE OF ASSETS TO THE**
**STALKING HORSE, (II) THE STALKING HORSE ASSET PURCHASE AGREEMENT,**
**(III) GRANTING OF STALKING HORSE PROTECTIONS, AND**
**(IV) GRANTING RELATED RELIEF**

Quaint Oak Bank ("Quaint Oak") by and through its undersigned counsel Obermayer Rebmann Maxwell and Hippel LLP,  hereby files these Limited Objections to (i) Sale of the Debtor's Assets to Stalking Horse Purchaser, (II) the Stalking Horse Asset Purchase Agreement, (iii) the Approval of Stalking Horse Protections, and (iv) Granting Related Relief (the "Objection").  In support of these Limited Objections, Quaint Oak states as follows:

**I.      Preliminary Statement.**

Quaint Oak has supported the Debtor's efforts to sell its assets to the highest bidder and believes the sale procedures authorized by the Court were a valid exercise of the Debtor's business judgment.  There is ample justification for the decision to sell.  However, Quaint Oak now believes that its collateral was used to provide an unintended benefit to the Stalking Horse Purchaser, which is an insider of the Debtor, to the detriment of Quaint Oak and unsecured creditors, of which Quaint Oak is likely to be the largest.  Quaint Oak also avers that it should be paid on its fully secured claim at closing on any sale of the Assets including the money held in the Restricted Cash Account (as defined in the Final Cash Collateral Order [ECF # 110] from the prior sale of assets.[1]  Quaint

---

[1] All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Debtor's April 3, 2026 Motion for (A) Entry of an Order (I) Approving Bidding Procedures; (II) Approving Procedures for the

Oak believes that approval of the sale of the Debtor's assets with a finding of good faith under section 363(m) of the Bankruptcy Code does not best serve the interests of the Debtor's bankruptcy estate or its creditors.

**II.      Background.**

1.      Quaint Oak's Secured Claim arises out of money loaned by Quaint Oak Bank to Allied Telecom Group, LLC ("Allied Telecom" or "Debtor") pursuant to a December 11, 2020 Promissory Note (the "Note") pursuant to which Quaint Oak issued a commercial loan to the Debtor in the principal amount of Ten Million Seven Hundred Ninety Thousand Two Hundred Seventy-Two dollars and 00/100 cents ($10,790,272.00) and secured by a Security Agreement (the "Security Agreement") providing, *inter alia*, a first priority security interest in the Business Assets of the Debtor including but not limited to the Restricted Cash Account containing approximately $521,244, but excluding certain assets (together, the "Collateral"), as security for the Note.

2.      On or about December 15, 2023, the Debtor and Quaint Oak entered into an agreement amending the Note to be in the principal sum of Eleven Million One Hundred Twenty Eight Thousand Eight Hundred Thirty Five dollars and 73/100 cents ($11,128,835.73) (the "Amended Note" or together with the Note, and all other documents associated with the foregoing and all corporate and individual guaranties, the "Loan Documents").

3.      Quaint Oak's first liens were fully perfected by the filing of a UCC Financing Statement on or about December 28, 2020 with the Washington, D.C. Recorder of Deeds and

---

Assumption and Assignment of Executory Contracts and Unexpired Leases; (III) Approving Stalking Horse Protections; (IV) Scheduling Bid Deadline, Auction Date, and Sale Hearing Date; (V) Approving Form of Notice Thereof; (B) Entry of and Order after the Sale Hearing (I) Authorizing the Debtor to Sell its Assets; and Authorizing The Debtor To Assume And Assign Certain Executory Contracts and Unexpired Leases; and (C) Granting Related Relief (the "Procedures Motion") (ECF # 114) or the Order approving the Procedures Motion (as modified by Notice dated May 11, 2026 (ECF # 135), the "Procedures Order") (ECF # 131).

4900-7977-0546 v2

amendments were filed on December 18, 2023 and August 5, 2025.  As of the Petition Date, Allied Telecom owed Quaint Oak an outstanding balance of $7,829,233.66.

4.      The Court has entered a Final Order on the Debtor's Motion for Use of Cash Collateral and Granting Adequate Protection [ECF # 110] acknowledging that the Challenge Period set forth in the Interim Cash Collateral Orders, has expired and Quaint Oak is in a duly perfected first position lien position on all of the Debtor's Assets. including its cash.

5.      On April 3, 2026, the Debtor filed the Procedures Motion and on April 23, 2026, the Court entered the Procedures Order.

6.      On April 29, 2026, Quaint Oak timely filed secured proof of claim in the Debtor's bankruptcy case for $7,829,233.66 (Claim No. 10-1).

7.      On May 13, 2026, the Debtor filed its Notice of (i) Designation of Stalking Horse Purchaser and (ii) Hearing to Approve the  (a) Stalking Horse Purchaser, (b) Stalking Horse Agreement, and (c) the Stalking Horse Protections (ECF # 136) identifying Lightcore Metronet, LLC ("Lightcore") as its proposed Stalking Horse Purchaser with a purchase price of $1,000,000,00 plus the assumption of certain liabilities.

8.      On May 21, 2026 the Bankruptcy Court conducted a hearing on the Debtor's request for authority to designate Lightcore as the Stalking Horse Purchaser and at the hearing, the Debtor and Lightcore withdrew the request for approval of the Stalking Horse Protections.

9.      On May 22, 2026, over the objections of the United States Trustee and Quaint Oak, the Bankruptcy Court entered the Order Approving the Stalking Horse Purchaser and Stalking Horse Agreement; however the Bankruptcy Court denied the Debtor's request to grant the Purchaser the good faith protections afforded by section 363(m) of the Bankruptcy Code.

4900-7977-0546 v2

10.     On May 28, 2026 the Debtor filed a notice that the Debtor did not receive any bids aside from the Stalking Horse Bid by the Bid Deadline, May 27, 2026 and canceling the Auction.

### III.     Limited Objections.

11.     As this Court is now aware, Lightcore, the Stalking Horse Purchaser, is owned and/or controlled by Ken Williams, a statutory insider and affiliate of the Debtor pursuant to 11 U.S.C. §§ 101(2)(A) and 101(31)(B) and upon information and belief, Lightcore is a statutory affiliate of the Debtor pursuant to 11 U.S.C. § 101(2)(B).

12.     For the reason set forth below, Quaint Oak respectfully submits that it would be inappropriate for the Court to make a finding that Lightcore is a good faith purchaser under section 363(m) of the Bankruptcy Code.

13.     In addition, Quaint Oak argues that the sale really constitutes an improper *sub rosa* plan of reorganization that should not be approved by this Court.

14.     Finally, the Stalking Horse APA inappropriately "catches and kills" any potential claims, including claims against Williams, as well as avoidance actions including three transfers made within 90 days of the petition date to Lightcore.  These are likely the only remaining source of recovery to unsecured creditors, of which, Quaint Oak will likely be the largest.

### IV.     Argument.

#### A.     There Should be no Finding of Good Faith as to the Insider Stalking Horse Purchaser

15.     First, Quaint Oak respectfully submits that there should be no finding of good faith as to the insider stalking horse bidder.

16.     Section 363(m) articulates the "good faith" requirement of a section 363 asset sale. *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 149-50 (3d Cir. 1986).

4900-7977-0546 v2

17.     The Bankruptcy Code does not define "good faith," but based on "traditional equitable principles" courts hold that "the phrase encompasses one who purchases in good faith and for value." *In re Pursuit Cap. Mgmt., LLC*, 874 F.3d 124, 135 (3d Cir. 2017).

18.     A purchaser is deemed to be a good faith purchaser for purposes of Section 363(m) when it "purchases the assets for value, in good faith, and without notice of adverse claims." *In re Tamojira, Inc.*, 212 B.R. 824, 826 (Bankr. E.D. Va. 1997) (citing *Willemain v. Kivitz*, 764 F.2d at 1023).

19.     A court may not find good faith if fraud, collusion or unfair advantages are determined. *Abbotts Dairies*, 788 F.2d at 147.

20.     In determining whether an asset purchaser is entitled to such protections, courts examine "the integrity of his conduct in the course of the sale proceedings." Id. at 148.

21.     In assessing the good faith of a purchaser, courts have considered factors such as: (1) whether the sale was negotiated at arm's length; (2) whether any officer or director of the debtor holds any interest in or is otherwise related to the potential purchaser; and (3) whether fraud or collusion exists among the prospective purchaser, any other bidders or the trustee. Id. at 147-48.

22.     A finding of good faith cannot be implicit, and courts have declined to make good faith findings for various reasons. *Matter of Perona Bros., Inc.*, 186 B.R. 833, 839 (D.N.J. 1995) (stating a bankruptcy court must make an explicit finding of good faith); *In re Primel*, 629 B.R. 790, 801-02 (Bankr. W.D. Pa. 2021) (declining to make a good faith finding where the winning bidder attempted to chill bidding, but still approving the sale); *In re Gunboat Int'l, Ltd.*, 557 B.R. at 421-22 (stating that there could be no good faith finding due to the inability to ascertain the overall value to a Chapter 11 debtor's estate of purchaser's purchase price).

23.     A party will not be deemed a good-faith purchaser if they seek to maximize its leverage by dictating the terms of a Chapter 11 plan up front without following the guidelines of the Bankruptcy Code. *In re Boy Scouts of Am.*, 137 F.4th 126, 157 (3d Cir. 2025); *In re Hertz Corp.*, 120 F.4th 1181, 1205 (3d Cir. 2024).  Similarly, an intentional attempt by a purchaser to transact by "means forbidden by law" is not considered to be good faith. *In re Boy Scouts of Am.*, 137 F.4th at 157 (3d Cir. 2025) (quoting *Abbotts Dairies*, 788 F.2d at 150).

24.     Here, Lightcore, an entity the Debtor acknowledges is owned and controlled at least in part by Ken Williams, who is an owner of the Debtor, was created on July 30, 2025, mere months before the bankruptcy case was filed and at the same time the Debtor was in contact with Quaint Oak about a potential forbearance or alternative work out of the rapidly approaching maturity date of the Note.  See Corporation Search attached hereto as Exhibit "A" and incorporated herein.

25.     Lightcore is not in good standing.  See Exhibit "A".

26.     In addition, the entity that organized Lightcore, SWDC Ventures, LLC ("SWDC"), is a company formed in Wyoming and is also owned and/or controlled by Ken Williams.  See SWDC Ventures, LLC formation documents attached hereto as Exhibit "B" and incorporated herein.

27.     More troubling, Lightcore received three transfers within the 90 days preceding the petition date which are potentially avoidable, a fact not disclosed to this Court during the bidding process or during the hearing to designate Lightcore the Stalking Horse Purchaser.  See the spreadsheet produced by the Debtor on May 29, 2026 attached hereto as Exhibit "C" and incorporated herein.

28.     Those payments were made on November 4, 2025 in the amount of $25,000.00, December 8, 2025 in the amount of $25,000.00 and December 16, 2025, just one week prior to the

6

petition date, in the amount of $50,000.00.  See Exhibit "C" and the Debtor's Statement of Financial Affairs (the "SOFA") [ECF # 56].

29.    In addition, Lightcore did not have a prepetition executory contract with the Debtor, as evidenced by the fact that it is not listed in the Debtor's Schedule G.  See Schedule G [ECF # 56].

30.    While those payments were reported in the SOFA as payments made within the 90 days prior to the petition date, Lightcore, a clear insider of the Debtor, was not reported as the recipient of transfers within the one year prior to the petition date, when it is clear that such transfers exist.

31.    Quaint Oak has also questioned certain transactions in the Debtor's most recent Monthly Operating Report and requested documents in connection with the preference period transfers, but has not received anything in response except an e-mail saying that the documents would be produced on a rolling basis and would take a long time.

32.    Two of the factors courts routinely consider in assessing good faith under section 363(m) of the Bankruptcy Code are in existence here.

33.    It is difficult to imagine that the Stalking Horse APA was negotiated at arms length where Ken Williams was essentially negotiating with himself.

34.    In addition, Ken Williams is the owner and/or operator of both the Debtor and the proposed purchaser, Lightcore.

35.    It is respectfully submitted that the sale was not negotiated in good faith and the Debtor has claims against Lightcore that were undisclosed by the Debtor – Quaint Oak was left to discover those avoidable transfers on its own, when they should have been disclosed by the Debtor and Lightcore at the outset.

**B.    The Sale is an Improper *Sub Rosa* Plan of Reorganization That Cannot be Approved by this Court.**

36.    "[B]ecause there is some danger that a section 363 sale might deprive parties of substantial rights inherent in the plan confirmation process, sales of substantial portions of a debtor's assets under section 363 must be scrutinized closely by the court." *In re Abbotts Dairies of Pa., Inc.,* 788 F.2d 143, 150 (C.A.3 1986). Section 363(b) does not authorize and cannot be used to effect transactions or settlements that amount to a "*sub rosa* plan" of reorganization. *In re Energy Future Holdings Corp.*, 648 F. App'x 277, 284-85 (3d Cir. 2016); *In re Naron & Wagner, Chartered*, 88 B.R. 85, 88 (Bankr. D. Md. 1988).

37.    A sub rosa plan exists "when a transaction or settlement in bankruptcy has the effect of dictating some of the terms of any future reorganization plan" or impermissibly dictates the outcome to other creditors. *In re Clouter Creek Reserve LLC*, 669 B.R. 764, 792 (Bankr. D.S.C. 2025); *In re Boy Scouts of Am.*, 137 F.4th 126, 156 (3d Cir. 2025); *In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 513 (Bankr. D. Del. 2010); *In re James River Coal Co.*, No. 14-31848-KRH, 2014 WL 7876949, at *6 (Bankr. E.D. Va. Dec. 29, 2014); *see also In re Energy Future Holding Corp.*, 527 B.R. 157, 168 (D. Del. 2015), *aff'd* 648 F. App'x at 284-85 (a *sub rosa* plan "amounts to a de facto plan of reorganization, which enables a debtor to restructure its debt while bypassing many of the Bankruptcy Code's fundamental creditor protections").

38.    To be found to dictate the terms of a plan, a transaction must either (i) dispose of all claims against the estate or (ii) restrict creditors' rights to vote.  *See Matter of Cajun Elec. Power CO-OP., Inc.*, 119 F.3d 349, 354-55 (5th Cir. 1997); *In re Braniff Airways, Inc.*, 700 F.2d 935, 940 (5th Cir.1983); *see also In re  Capmark Fin. Grp.*, 438 B.R. at 513; *In re Cloverleaf Enters., Inc.*, No. 09-20056, 2010 WL 1445487, at *3 (Bankr. D. Md. Apr. 2, 2010) (adopting the holding in *Braniff Airways, Inc.*).

4900-7977-0546 v2

39.     In analyzing whether a transaction impermissibly dictates the outcome to other creditors, courts look to see whether the transaction "subverts the bankruptcy process." *In re Energy Future Holding Corp.*, 527 B.R.at 284-85. If a transaction attempts to "restrict creditors' right in Chapter 11 to vote on a proposed plan of reorganization" it will be held to be a sub rosa plan. *In re Clouter Creek Reserve LLC*, 669 B.R. at 792. Courts will reject transactions that "accomplish an end run around the protection granted creditors in Chapter 11 of the Bankruptcy Code." *In re Biolitec, Inc.*, 528 B.R. 261, 269-72 (Bankr. D.N.J. 2014) (quoting *In re Cont'l Air Lines, Inc.,* 780 F.2d 1223, 1224 (5th Cir.1986)). A transaction attempting to "restrict creditors' right in Chapter 11 to vote on a proposed plan of reorganization" is one such end run around the Bankruptcy Code.  *In re Clouter Creek Reserve LLC*, 669 B.R. at 792. The same is true of structured dismissals. *In re Biolitec, Inc.,* 528 B.R. at 269-72 (rejecting a structured dismissal because it "seeks to alter parties' rights without their consent and lacks many of the Code's most important safeguards"); *see also Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 468 (2017) (holding that the Bankruptcy Code does not permit structured dismissals and acknowledging that sub rosa plans are ones that "circumvent the Code's procedural safeguards.").

40.     Put simply, a party "should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan sub rosa in connection with a sale of assets." *In re Braniff Airways, Inc.*, 700 F.2d at 940 (holding rejecting a proposed 363(b) sale as a sub rosa plan as it required a plan to allocate certain assets to certain parties, required creditors to vote portions of their deficiency claims in favor of a plan, and "provided for the release of claims by all parties against [the debtor], its secured creditors and its officers and directors."); *see also*, *In re Lionel Corp.*, 722 F.2d at 1069 (rejecting a proposed 363(b) sale as it sought to sell most of the debtor's important assets and  "swallow[ed] up Chapter

9

4900-7977-0546 v2

11's safeguards."); *In re Boy Scouts of Am.*, 137 F.4th at 156 (acknowledging and adopting the holdings in *Lionel Corp.* and *Braniff Airways*).

41.    Here, the Stalking Horse APA also purports to have Lightcore acquire all of the Debtor's causes of action including avoidance actions without even attempting to evaluate or value those causes of action.

42.    It is clear that the Debtor has not evaluated or valued the causes of action because the Debtor recently proposed to Quaint Oak that the Debtor have its professional undertake such an evaluation at a cost of $50,000.00, which Quaint Oak would have to pay for out of its cash collateral.  See May 29, 2026 e-mail from counsel to Debtor attached hereto as Exhibit "D" and incorporated herein.

43.    The only hope of funding a Plan and getting money to unsecured creditors is to preserve those causes of action in the Debtor's bankruptcy estate so a liquidating trust pursuant to a Plan can evaluate and potentially prosecute those causes of action.

44.    By "selling" the causes of action to Lightcore, which is controlled by a potential target of the causes of action, the Debtor is eliminating the path to a Plan and the only means of paying unsecured creditors.  In other words, the sale is the Plan if the Debtor has its way.

45.    The Sale of the causes of action would also result in a "catch and kill" which would be tantamount to an impermissible third party release of claims outside of a Plan and without the procedural safeguards a Plan would provide.

46.    Finally, Quaint Oak requests that the Sale Order provide for the immediate payment of Quaint Oak's secured claim at closing on any sale and the release of the funds from prior asset sales.

4900-7977-0546 v2

## V.    Conclusion.

33.    For the foregoing reasons Quaint Oak believes that, if the Court approves the sale, it should not make a finding of good faith as to Lightcore.

**WHEREFORE**, for the foregoing reasons, Quaint Oak prays the Court enter an Order in the form attached sustaining the Quaint Oak Limited Objections, modifying the Debtor's Sale Motion Order, and denying the Debtor's request to approve the good faith finding and the protections provided by section 363(m) of the Bankruptcy Code, providing for the payment of Quaint Oak Banks uncontested claim in full the Closing Date, and providing for such other and further relief as the court deems is fair and proper.

Respectfully Submitted,

Dated: June 8, 2026

By: */s/ Edmond M. George*
Edmond M. George, Esquire
Michael D. Vagnoni, Esquire (*pro hac vice*)
OBERMAYER REBMANN MAXWELL & HIPPEL LLP
Centre Square West
1500 Market Street, Suite 3400
Philadelphia, PA 19102
215-665-3066 – Telephone
215-665-3165 – Facsimile
Email: edmond.george@obermayer.com
        michael.vagnoni@obermayer.com

*Counsel to Quaint Oak Bank*

11

4900-7977-0546 v2